987 So.2d 892 (2008)
Randy Victor BROWN, Plaintiff-Appellee
v.
Melanie Lowery MOCK, Defendant-Appellant.
No. 43,571-CA.
Court of Appeal of Louisiana, Second Circuit.
July 16, 2008.
*893 Sophia Dixon Brown, for Appellant.
Richard L. Fewell, Jr., for Appellee.
Before CARAWAY, DREW and MOORE, JJ.
MOORE, J.
The mother, Melanie Lowery Mock, appeals a judgment that named the father, Randy Victor Brown, primary domiciliary parent of the parties' young daughter, Abigail ("Abby") Mock. Randy responds that Melanie's appeal should be dismissed as untimely. We affirm.

Procedural Background
Melanie and Randy met on the Internet in 2002 and had a physical affair for about one month. Randy did not believe her when she told him she was pregnant; he testified that she had been on the Web looking for someone to impregnate her. He was not present when Abby was born in September 2003, and admitted he began a relationship with the child only when she was about a year old, after DNA tests showed a 99.99997% probability of his paternity. Starting then, he exercised alternating weekend visitation.
On August 30, 2006, Melanie's mother, Ann Lowery, phoned Randy and begged him to come over because of a "situation." While shopping at Pecanland Mall, Melanie had a breakdown of some kind, and Randy needed to take Abby or else Child Protective Services would. Ms. Lowery then informed Randy that Melanie was bipolar, had previously been confined to a mental health facility, and once passed out at a local bar. According to Randy, this was his first inkling of Melanie's psychological impairment.
Randy and his current wife, Angela, testified that when Abby first came to live with them, she was skittish, underweight and eating poorly, but over the months she has blossomed. She has a bedroom of her own and a good relationship with her half-brother. Randy admitted he lost his job when the Guide Plant closed and would possibly have to commute to a new job at a mill in Crossett, Arkansas, but he intended to keep the house in Monroe, where he and his family are ardent churchgoers. At the various hearings, Ms. Lowery elaborated on Melanie's erratic behavior and testified that Randy should have primary custody of Abby. While Abby has been in Randy's custody, she has spent a lot of time with Ms. Lowery.
Melanie admitted that since getting out of Glenwood Behavioral Center in September 2006, she had lived in four different places, had two live-in boyfriends (and two casual boyfriends who did not move in), and made ends meet from SSI and child support from her first husband. She admitted having bipolar disorder which she occasionally neglected to treat with antipsychotic and mood-stabilizing drugs that have been prescribed. She admitted that in an earlier custody dispute involving her 10-year-old son, the Fourth JDC had given her only restricted visitation. She admitted having to take out a protective order against one of her live-in boyfriends. Mostly, however, Melanie was incensed that Randy ignored his daughter until she was one year old and then took her away while Melanie was suffering serious emotional problems.
Randy filed the instant motion for custody in September 2006, seeking primary domiciliary custody; Melanie reconvened for primary domiciliary custody. A hearing *894 for interim custody was held over five days, October 11, 2006, and January 11, 16, 17 and 18, 2007. The court rendered an "Interim Ruling & Order" on February 9, 2007, awarding joint custody with Randy as the primary domiciliary parent, and Melanie to receive visitation every other weekend and every Wednesday, subject to special conditions. The court also issued a "Review Hearing Schedule & Order," fixing five monthly review hearings to assure that Melanie was adhering to the interim ruling by taking her required medication.
Trial for permanent custody was held over two days, April 19 and 20, 2007. In addition to the parties and lay witnesses, Dr. E.H. Baker, a general psychologist, related the results of the Minnesota Multiphasic Personality Inventory ("MMPI") he conducted on Melanie in 2001 for another custody case. He confirmed that she was bipolar, disabled for purposes of SSI, and had the psychotic tendency to present herself in the most favorable possible light. He had not examined her since 2001, but reviewed her 2006 medical records and found her noncompliant with her medication. He concluded that a parent in her condition would place a child in a "difficult situation."
The district court filed reasons for judgment on May 17, attaching an "Article 134 Check Sheet," finding joint custody proper with Randy as primary domiciliary custodian; Melanie received unsupervised visits on alternating weekends and Wednesdays, but no overnight visitation.[1] Final judgment, not rendered until August 13, 2007, retained the scheme of alternating weekends and Wednesdays, but included detailed provisions for sharing holidays and was silent as to overnight visitation.
Randy filed a motion to reopen the evidence, alleging that when Abby returned from a visit with Melanie, she reported acts of domestic violence between Melanie and someone named Willie. Melanie also filed a motion to reopen the evidence, citing her need to explain the allegations. The court denied both motions, advising the parties that they would have "ample opportunities to make presentations at the hearing to be set by this court after the last review hearing is held."
On August 6, 2007, the court issued an "Order & Rule Nisi" directing Randy to show why Melanie should not receive overnight visits, and Melanie to show why Randy should not retain primary domiciliary status. After a hearing on September 11, the court issued a "Ruling, Judgment & Order" finding insufficient evidence of a substantial change that would satisfy Bergeron v. Bergeron, 492 So.2d 1193 (La. 1986), and retaining Randy as primary domiciliary parent. However, the order gave Melanie two additional visits during her noncustodial weeks.
Melanie filed a motion for new trial; apparently, the district court held a phone conference, as there is no transcript of a hearing. On January 19, 2008, in a "Ruling on Motion for New Trial," the court denied Melanie's motion. The court also alluded to Randy's objection to the timeliness of the motion (not included in the record) and denied it. Melanie took the instant appeal.

The Parties' Contentions
By one assignment of error, Melanie urges the court abused its discretion in making Randy the domiciliary parent "contrary to the voluminous evidence presented at trial," resulting in a manifestly erroneous application of C.C. art. 134. In brief, she discusses the statutory factors *895 one by one. For instance, she contests the court's findings that the parties were equal in their love, affection and other emotional ties to Abby, and that Randy is more "moral" than Melanie. She alleges no errors of law.
Randy responds that the court rendered its final custody decree on August 13, 2007. The only proper vehicle to modify a considered decree is a rule that complies with Bergeron, supra, but Melanie filed no such rule. Specifically, "Louisiana has no mechanism or statutory authority for `review hearings' in custody cases between individual parties." R.J. v. M.J., 2006-2676 (La.App. 1 Cir. 5/14/04), 880 So.2d 20. The "Ruling, Judgment & Order" of September 11 was, he contends, a review hearing judgment and without legal effect. He concludes that the motion for new trial filed October 8, 2007, and notice of appeal filed January 25, 2008, were untimely, and the appeal should be dismissed for lack of jurisdiction.
On the merits, he submits that Melanie's complaints are all factual and were properly addressed by the district court. He concludes that the current custody plan should be retained, either by dismissing Melanie's appeal or affirming the judgment.

Discussion
We have closely examined this protracted record and are constrained to agree with Randy's characterization of the procedure. The hearing for interim custody spanned five days, 15 witnesses (Melanie and Randy each testified three times), and nearly 500 transcript pages. At the beginning of the trial for permanent custody, the parties adopted all the evidence from the interim hearing, and then introduced the testimony of nine witnesses over two days, comprising 250 transcript pages. These proceedings resulted in a final, considered decree of custody rendered on August 13, 2007, naming Randy the primary domiciliary parent.
What followed was a sequence of review hearings to assure Melanie's compliance. However, "review hearings" can be held in juvenile cases as set forth in La. Ch. C. art. 1454, not in civil custody cases. Brown v. Brown, XXXX-XXXX (La.App. 3 Cir. 3/1/06), 925 So.2d 662; R.J. v. M.J., supra. These patently unauthorized proceedings cannot suspend the delays for appealing. Hence, we would agree that Melanie's motion for new trial, filed October 8, 2007, was untimely under La. C.C.P. art. 1974, as was the motion for appeal, filed January 25, 2008, under La. C.C.P. art. 2087 A.
We recognize, however, that the parties acquiesced in these hearings at the district court's direction; further, there is no indication that Randy objected to them until Melanie filed a motion for new trial on October 8, 2007. In the interest of fairness to the parties, and because the record is so complete, we have elected to review the evidence on the merits.
In a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child. La. C.C. art. 131. The court shall consider all the relevant factors in determining the best interest of the child. La. C.C. art. 134.[2] The determination *896 of the trial court in child custody matters is entitled to great weight; this discretion will not be disturbed on review in the absence of a clear showing of abuse. AEB v. JBE, 99-2668 (La.11/30/99), 752 So.2d 756; Bergeron v. Bergeron, supra; Mayo v. Henson, 42,250 (La.App. 2 Cir. 5/9/07), 957 So.2d 318.
As noted, the district court received and considered a quantity of evidence almost incomprehensible for a fairly routine custody dispute: seven days of testimony, 16 witnesses (many of whom testified multiple times), 155 photos, assorted school and daycare records admitted in evidence, and nearly 700 pages of medical records placed under seal. Out of courtesy to the parties, this court will not belabor the cumulative accounts of Melanie's breakdown, her sequence of residences, her abusive family members and boyfriends, and descriptions of her erratic behavior. The court's findings as to each factor under Art. 134 are more than amply supported by this immense record. Melanie's long history of failing to control her mental illness and her unstable living arrangements plainly outweighed the other equal or neutral factors. The stability of Randy's home and the child's good adjustment since living with him plainly weighed in his favor. We perceive no manifest error.
The parties and the district court are reminded that the judgment in this case is a considered decree of custody. Unjustified litigation, the threat of litigation, or continued parental conflict can adversely affect a child. Bergeron v. Bergeron, supra; Cedotal v. Cedotal, XXXX-XXXX (La.App. 1 Cir. 11/4/05), 927 So.2d 433. The judgment cannot be modified unless the party seeking the change bears the heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification, or proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. Bergeron v. Bergeron, supra; Pahal v. Taylor, 42,698 (La.App. 2 Cir. 8/29/07), 965 So.2d 574. A succession of review hearings, ex parte rules to show cause, and untimely motions for new trial violate the principles of Bergeron and disserve the child's best interest.

Conclusion
For the reasons expressed, the judgment is affirmed. Appellate costs are to be paid by Melanie Lowery Mock.
AFFIRMED.
NOTES
[1] Presumably the denial of overnight visits applied to Wednesdays, as weekend visits were specified to begin at 5:00 pm Friday and end at 5:00 pm Sunday.
[2] "Such factors may include: (1) The love, affection, and other emotional ties between each party and the child. (2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child. (3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs. (4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment. (5) The permanence, as a family home, of the existing or proposed custodial home or homes. (6) The moral fitness of each party, insofar as it affects the welfare of the child. (7) The mental and physical health of each party. (8) The home, school, and community history of the child. (9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference. (10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party. (11) The distance between the respective residences of the parties. (12) The responsibility for the care and rearing of the child previously exercised by each party." La. C.C. art. 134.